William D. BRYAN, Plaintiff,

v.

The FEDERAL OPEN MARKET COMMITTEE et al., Defendants.

Civ. No. 445.

United States District Court
D. Montana,
Billings Division.

Dec. 7, 1964.

Roy V. Morledge, Jr., and Raymond A. Wright, Billings, Mont., for plaintiff.

John W. Douglas, Asst. Atty. Gen., Harland F. Leathers and R. Dickey Hamilton, Department of Justice, Washington, D. C., Moody Brickett, U. S. Atty., Butte, Mont., and Richmond F. Allan, Asst. U. S. Atty., Billings, Mont., for defendants.

JAMESON, District Judge.

Plaintiff, alleging that he is the owner of a treasury bill, an obligation of the United States that is bought and sold on the open market, seeks a judgment (1) declaring the powers of the Federal Open Market Committee an unwarranted delegation of power by Congress; and (2) restraining its members from purchasing and selling obligations of the United States on the open market. The defendants filed a motion to dismiss the complaint, or in the alternative, for summary judgment on the grounds that: (1) plaintiff lacks standing to maintain the action; (2) the court lacks jurisdiction over the subject matter; (3) the action is an unconsented suit against the United States; (4) the complaint fails to state a claim upon which relief can be granted; (5) the venue is improper; and (6) the court lacks jurisdiction over the persons of the defendants. The motion is supported by an affidavit of the assistant secretary of the Federal Open Market Committee. Briefs were filed by the respective parties, and a hearing was held on defendants' motion.

Plaintiff alleges that the Federal Open Market Committee buys and sells treasury bills on the open market and that these purchases and sales affect the value of the treasury bills and other obligations of the United States; that plaintiff's property interest in his treasury bill is thereby affected; that the Federal Open Market Committee meets in secret and uses funds not appropriated by Congress; that the decisions of the Committee are made without a mandate from Congress; that plaintiff is unable to speculate in government obligations because the Committee's criteria for purchase and sale of securities are kept secret; that the five private members of the Committee take

no oath of office; that the Committee regulates the value of obligations of the United States without a mandate from Congress; and that the powers exercised by the Committee constitute an unconstitutional delegation of power by Congress.[1]

The Federal Reserve Act of 1913, as amended, authorizes the Federal Reserve banks to engage in the open market purchasing and selling of specified securities and commercial paper, including treasury notes. 12 U.S.C. § 353–359. The Federal Open Market Committee was established by an amendment to the Act adopted in 1933. 12 U.S.C. § 263. The Committee consists of the members of the Board of Governors of the Federal Reserve System and five representatives of the Federal Reserve banks.

Section 263 provides in pertinent part:

"(b) No Federal Reserve bank shall engage or decline to engage in open-market operations under sections 353 to 359 of this title except in accordance with the direction of and regulations adopted by the Committee. The Committee shall consider, adopt, and transmit to the Federal Reserve banks, regulations relating to the open-market transactions of such banks.

"(c) The time, character, and volume of all purchases and sales of paper described in sections 353–359 of this title as eligible for open-market operations shall be governed with a view to accommodating commerce and business and with regard to their bearing upon the general credit situation of the country."

It is clear from the statute itself, as well as the affidavit of the assistant secretary of the Committee, that the Committee itself does not engage in open market operations. It does, however, formulate policies governing these operations and it does dictate to the Federal Reserve banks what securities they may buy and sell and the time of the purchases and sales.

Congress has authorized the Federal Reserve banks to issue the notes and create the bank deposits used in carrying out the open market operations. 12 U.S. C. §§ 411–421. The Committee itself does not receive funds or disburse funds or credit in connection with the open market operations.

The Board of Governors of the Federal Reserve System is required to file an annual report with Congress which includes "a full account of the action so taken during the preceding year with respect to open-market policies and operations * * *". (12 U.S.C. §§ 247, 247a.)

In Raichle v. Federal Reserve Bank, 2 Cir. 1929, 34 F.2d 910, 67 A.L.R. 1167, a case decided prior to the creation of the Federal Open Market Committee, the owner of various securities sought to restrain the Federal Reserve Bank from doing various acts in derogation of plaintiff's rights. The court pointed out that it was "not contended that the provision for fixing rates of discount" was unconstitutional and continued, "nor would it seem even reasonable to argue that it is", in the light of various cases cited therein. The nature of the "open market operations" was clearly and succinctly

---

1. More specifically it is alleged and contended that the actions of the committee are in conflict with Article 1, Section 9 of the Constitution of the United States. Clause 7 provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." In Varney v. Warehime, 6 Cir. 1945, 147 F.2d 238, 245, cert. den. 325 U.S. 882, 65 S.Ct. 1575,

89 L.Ed. 1997, the Court held that this clause "relates to public funds arising from taxes, customs, etc., which are required by law to be deposited in the Treasury". The Court continued: "The mere fact that moneys are received by federal agencies in the lawful exercise of their public functions, standing alone, does not bring them within the constitutional or statutory provision requiring all 'public funds' to be covered into the Treasury and withdrawn only by an appropriation."

880

described in the court's opinion as follows:

"Federal Reserve Banks may also, under rules and regulations prescribed by the Federal Reserve Board, engage in 'open market operations'; that is to say, purchase and sell in the open market at home or abroad cable transfers and bankers' acceptances and bills of exchange of the kinds and maturities eligible for rediscount. They may deal in gold coin and bullion at home and abroad; buy and sell, at home and abroad, bonds and notes of the United States, and bills, notes, revenue bonds, and warrants with a maturity from date of purchase of not exceeding six months, issued by any state, county, district, political subdivision, or municipality in the United States, such purchases to be made in accordance with regulations prescribed by the Federal Reserve Board. They may purchase from member banks, and sell, bills of exchange arising out of commercial transactions, and may 'establish from time to time, subject to review and determination by the Federal Reserve Board, rates of discount to be charged by the Federal Reserve Bank for each class of paper, which shall be fixed with a view of accommodating commerce and business.' They may establish accounts with other Federal Reserve Banks, with the consent and upon the order and direction of the Federal Reserve Board, and, under regulations to be prescribed by said board, may open accounts and establish agencies in foreign countries for the purpose of purchasing, selling, and collecting bills of exchange. They may purchase and sell in the open market, either from or to domestic banks, firms, corporations, or individuals, acceptances of Federal Intermediate Credit Banks and of national agricultural credit corporations whenever the Federal Reserve Board shall declare that the public interest so requires. USCA tit. 12, c. 3, §§ 353–357." (p. 913.)

While the Federal Reserve Act was subsequently amended in 1933, 1935, and 1942, the provisions of the Act with respect to open market operations are essentially the same as those considered in the Raichle case, except that the open market operations are now directed by the Federal Open Market Committee.

■ Section 2282 of Title 28 U.S. Code provides that "An * * * injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title". It is well settled, however, that a single judge, in ruling on a motion to dismiss, may in the first instance determine whether the court has jurisdiction and whether a substantial federal question is presented. California Water Service Co. v. Redding, 1938, 304 U.S. 252, 58 S.Ct. 865, 82 L.Ed. 1323; Wicks v. Southern Pacific Co., 9 Cir. 1956, 231 F.2d 130, cert. den. Wicks v. Brotherhood of Maintenance, 351 U.S. 946, 76 S.Ct. 845, 100 L.Ed. 1471; Eastern States Petroleum Corporation v. Rogers, 1959, 105 U.S.App.D.C. 219, 265 F.2d 593, mandamus denied, 361 U.S. 805, 80 S.Ct. 93, 4 L.Ed.2d 56.

It is defendants' first contention that plaintiff has no standing to challenge the constitutionality of the powers of the Federal Open Market Committee, in that he has no legally cognizable right to a given monetary policy to be followed by the federal government nor to any policy of buying and selling securities.

■ In Massachusetts v. Mellon, 1923, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078, the Court recognized that it had no power per se to review and annul acts of Congress on the ground that they are unconstitutional; that the question of constitutionality may be considered only "when the justification for

some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act". To invoke the judicial power to challenge acts and powers on the ground that a statute is unconstitutional, the "party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally". In that case it was held that a taxpayer had no standing to challenge the constitutionality of a statute which would result in increased taxes, the Court saying in part:

"If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review, but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned. The bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained."

In Tennessee Electric Power Co. v. T. V. A., 1939, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543, the Court held that private power companies had no standing to challenge the constitutionality of the Tennessee Valley Authority, saying in part:

"The appellants invoke the doctrine that one threatened with direct and special injury by the act of an agent of the government which, but for statutory authority for its performance, would be a violation of his legal rights, may challenge the validity of the statute in a suit against the agent. The principle is without application unless the right invaded is a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." (306 U.S. at 137–138, 59 S.Ct. at 369.)

See also Alabama Power Co. v. Ickes, 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, holding that an electric power company had no standing to question the validity of loans and grants under a federal statute, or the validity of that statute under the federal constitution; Perkins v. Lukens Steel Company, 1940, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108, where it was held that iron and steel companies, prospective bidders on government contracts, had no standing to challenge the determination of the Secretary of Labor establishing localities in which employees working on government contracts would have to pay uniform minimum wages; Pauling v. McElroy, 1960, 107 U.S.App.D.C. 372, 278 F.2d 252, holding that the appellants, 39 individuals, who sought to enjoin the detonation of nuclear weapons which might produce radiation and alleging that the Atomic Energy Act of 1954 was unconstitutional, had no standing to sue since they did not "allege a specific threatened injury to themselves, apart from others * * *"

In City of Atlanta v. National Bituminous Coal Commission, D.C.1939, 26 F.Supp. 606, a three judge court passed upon the constitutionality of the National Bituminous Coal Act which authorized a commission created thereby to fix minimum coal prices. In upholding the constitutionality of the Act, the court "assumed" that there were "sufficient well pleaded allegations in the complaint to show that the plaintiff has legal standing which permits it to bring this suit". The Supreme Court, however, affirmed in a per curiam opinion "on the ground that the appellant has no standing to maintain the suit". City of Atlanta v. Ickes, 308 U.S. 517, 60 S.Ct. 170, 84 L.Ed. 440.

█ The rule followed in the foregoing cases is applicable here. Plaintiff has alleged no direct injury and claims

no specific damages. There is no contention that his treasury bill will not be paid at maturity. He claims only that its interim speculative value is affected and that he is unable to speculate in government obligations because the criteria for purchase and sale are secret and unknown to him. He has not alleged any injury to himself apart from that suffered by all other owners of government obligations. Paraphrasing Massachusetts v. Mellon, supra, if plaintiff could champion and litigate such a case, every other owner of government obligations affected by the operations of the Open Market Committee could do the same.

Plaintiff's brief is devoted largely to quotations from hearings before a Congressional Committee relative to the functions and operations of the Federal Open Market Committee. Plaintiff's complaint and views on the monetary policy of the United States may properly be presented to Congress. It is not the function of the judiciary to hear and determine claims of this nature.[2] In other words, plaintiff has not presented a justiciable case or controversy.

In Raichle v. Federal Reserve Bank, supra, the court pointed out that defendant had "made a persuasive argument that upon the facts alleged the questions raised are political, and not justiciable", but stated that it had not discussed this argument "because without it the defendant's position seems to be unassailable". (34 F.2d at 916). The same is true here.

Having concluded that plaintiff has no standing to sue, it is unnecessary to discuss and rule upon the other questions presented by defendants' motion to dismiss, many of which appear to be well taken.

---

2. In Raichle v. Federal Reserve Bank, supra, the court pointed out that: " * * * It would be an unthinkable burden upon any banking system if its open market sales and discount rates were to be subject to judicial review. Indeed, the correction of discount rates by judicial decree seems almost grotesque, when we remember that conditions in the money market often change from hour to hour, and the disease would ordinarily be over long before a judicial diagnosis could be made." (34 F.2d at

915). Nor could Congress itself react to the hourly changes in the money market, both domestic and international, in directing open market operations. In delegating this power to the Federal Reserve Board and the Federal Open Market Committee Congress has adequately delineated the general policy to be followed and the boundaries of the delegated authority. See, for example, American Power Co. v. S. E. C., 1946, 329 U.S. 90, 105, 67 S.Ct. 133, 91 L.Ed. 103.